## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATRICK EDDINGTON,**

      *Plaintiff,*

    **v.**

**U.S. DEPARTMENT OF JUSTICE,**

      *Defendant.*

**Civil Action No. 19-1991 (FYP)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Patrick Eddington submitted a request under the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552, for all records retained by the National Security Division ("NSD") of the United States Department of Justice ("DOJ") that mention Amir Mohamed Meshal — a U.S. citizen who was detained by both Kenyan and Ethiopian government entities between 2006 and 2007.  Eddington brings this suit against the DOJ, alleging that the agency failed to promptly produce all non-exempt responsive records.  Before the Court are the parties' dueling motions for summary judgment.  For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment and will deny Plaintiff's Motion for Partial Summary Judgment.

## LEGAL FRAMEWORK

The FOIA "was enacted to facilitate public access to Government documents" in order to "'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)); *see also CIA v. Sims*, 471 U.S. 159, 166 (1985) (stating that the FOIA mandates broad disclosure of government records to the public).  Thus, upon receiving a request for information under the FOIA, an agency is required to conduct a reasonable search for

responsive records, *see Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999); and it must produce all responsive documents to the requester, except for those that the agency is entitled to withhold under the nine exemptions that are specified in the FOIA.  *See* 5 U.S.C. § 552(b); *Muckrock, LLC v. CIA*, 300 F. Supp. 3d 108, 119 (D.D.C. 2018) ("[T]he FOIA also specifies nine exemptions that allow agencies to withhold records from disclosure."); *see also Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984) (stating that the FOIA exemptions exist because "there are some government records for which public disclosure would be so intrusive — either to private parties or to certain important government functions — that FOIA disclosure would be inappropriate.").  Because the "focus of the FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  Thus, "[a]ny reasonably segregable portion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).

As an alternative to producing requested records or withholding such records under an established FOIA exemption, an agency may also respond to a FOIA request by issuing what has come to be known as a "*Glomar*" response.  *See, e.g.*, *Wolf v CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013).  "A *Glomar* response permits an agency to 'refuse to confirm the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exemption.'"  *Casey v. FBI*, 302 F. Supp. 3d 209, 212 (D.D.C. 2018) (alteration in original) (quoting *Wolf*, 473 F.3d at 374).  "To the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents."  *Lindsey*

*v. FBI*, 271 F. Supp. 3d 1, 4 (D.D.C. 2017) (alteration, internal quotation marks, and citation omitted). "In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374 (citation omitted). Thus, a *Glomar* response is appropriate when the existence of the underlying documents is protected from disclosure by one of the nine FOIA exemptions. *See id.* (a *Glomar* response is "proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption.").

FOIA exemptions that can provide the basis for a *Glomar* response include Exemptions 1, 6, 7(A), and 7(C). *See id.* at 375 (analyzing a *Glomar* response under FOIA Exemption 1); *Roth v. DOJ*, 642 F.3d 1161, 1173–77 (D.C. Cir. 2011) (analyzing a *Glomar* response under FOIA Exemptions 6 and 7(C)); *Leopold v. DOJ*, 301 F. Supp. 3d 13, 21–27 (D.D.C. 2018) (analyzing a *Glomar* response under FOIA Exemption 7(A)). FOIA Exemption 1 allows the withholding of information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1)(A). FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings[.]" 5 U.S.C. § 552(b)(7)(A). FOIA Exemptions 6 and 7(C) protect similar information, with Exemption 6 protecting "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6); and Exemption 7(C) protecting law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(7)(C).

In analyzing the appropriateness of a *Glomar* response, the "D.C. Circuit has advised courts to accord substantial deference to an agency's *Glomar* response and avoid 'searching judicial review' when the information requested 'implicat[es] national security, a uniquely executive purview.'" *Schaerr v. DOJ*, 435 F. Supp. 3d 99, 111 (D.D.C. 2020) (alteration in original) (quoting *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926–27 (D.C. Cir. 2003)); *see also King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987) ("[T]he court owes substantial weight to detailed agency explanations in the national security context."). Moreover, the court "must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm[.]" *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980).

"'FOIA cases typically and appropriately are decided on motions for summary judgment.'" *Judicial Watch, Inc. v. Dep't of Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). Rule 56 of the Federal Rules of Civil Procedure requires that a court grant a motion for summary judgment when the pleadings, disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Judicial Watch*, 25 F. Supp. 3d at 136 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). In the FOIA context, a district court conducts a *de novo* review of the record when evaluating a motion for summary judgment, and the responding federal agency bears the burden of proving that it has complied with its obligations under the FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92–93 (D.D.C. 2008). The Court must analyze all underlying facts in the light most favorable to the FOIA requester, *see Willis v. DOJ*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008), and it

may grant summary judgment to an agency only after the agency establishes that it has "fully discharged its [FOIA] obligations," *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996).

## BACKGROUND

Plaintiff Patrick Eddington is a policy analyst and scholar at the Cato Institute, a libertarian think tank dedicated to advancing solutions based on individual liberty, limited government, and free markets. *See* ECF No. 15 (Amended Complaint), ¶ 2. Eddington spent nearly twenty years in federal service, specializing in intelligence and intelligence-oversight matters. *See* ECF No. 25-3 (Declaration of Patrick Eddington), ¶ 5. On March 13, 2007, while Eddington was working as a Senior Policy Advisor to then-U.S. Representative Rush Holt (D-NJ), Eddington received information from a journalist that Amir Mohamed Meshal, a U.S. citizen, was being detained by Kenyan authorities in Somalia. *Id.*, ¶ 8. Upon calling the journalist, Eddington learned that Meshal was from the district represented by Representative Holt. *Id.* On the evening of March 15, 2007, Eddington spoke with Meshal's father, who confirmed that Meshal was in the custody of the Kenyan government. *Id.*, ¶ 9. The FBI had told Meshal's father that his son was being detained on terrorism charges. *Id.* Eddington informed Representative Holt of the situation and then contacted the FBI. *Id.*, ¶ 10. On March 16, 2007, Eddington spoke to then-Assistant FBI Director for Counterterrorism Joseph Billy, Jr., who stated that Meshal was in the custody of the Ethiopian government and that the FBI had access to him. *Id.*, ¶ 11. Between March and May 2007, Eddington was in near daily contact with the FBI and the State Department about Meshal. *Id.*, ¶ 12. Meshal was released from detention in May 2007. *Id.*

After Meshal was freed, he filed a *Bivens* action[1] against several FBI agents in 2009.  *Id.*; *see Meshal v. Higgenbotham*, 47 F. Supp. 3d 115 (D.D.C. 2014).  In the *Bivens* action, Meshal alleged that while he was traveling in Africa, he was detained, interrogated, and tortured at the direction of, and by officials in, the American government.  *See Meshal*, 47 F. Supp. 3d at 116.  The district court granted the defendants' motion to dismiss the *Bivens* action, citing authorities that reject a *Bivens* remedy for government action taken in the name of intelligence-gathering, national security, or military affairs.  *Id.* at 117.  Meshal appealed that decision; and the D.C. Circuit affirmed the dismissal.  *See Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015).  There was also significant media coverage of Meshal's case, with articles written in the New York Times, the Chicago Tribune, and the Los Angeles Times.  *See* ECF No. 28 (Plaintiff's Reply) at 4 n.3 (citing news articles that discuss Meshal's detention and lawsuit).

On April 26, 2019, Eddington submitted a FOIA request to the DOJ, requesting "any records in the National Security Division (NSD) that mention Amir Mohamed Meshal, a U.S. citizen formerly of Tinton Falls, New Jersey and at the time a constituent of Rep. Rush Holt (D-NJ) and who was held by both Kenyan and Ethiopian government entities in 2006-2007."  Am. Compl., ¶ 6.  On June 3, 2019, the DOJ acknowledged receipt of the request.  *Id.*, ¶ 7; *see* ECF No. 27-2 (Declaration of Patrick N. Findlay), ¶ 5.

After receiving no further correspondence or production from the DOJ, Eddington filed the instant lawsuit on July 3, 2019.  *See* Am. Compl., ¶ 10.  Subsequently, the DOJ completed a search for records.  On October 31, 2019, the NSD provided a response letter, along with responsive documents that included twelve records (or 451 pages) that were released in full; but

---

[1]     Under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, a victim of constitutional violations may sue the responsible federal officers or employees for damages, despite the absence of a statute conferring that right.  *See* 403 U.S. 388, 389 (1971).

the NSD withheld two records in full under FOIA Exemption 5.  *Id.*, ¶ 12; Findlay Decl., ¶ 8.

The NSD also followed its "standard practice" in FOIA cases of "neither confirming nor denying

the existence of classified or investigative records, a so-called *Glomar* response."  Findlay Decl.,

¶ 8.[2]

The DOJ submits the declaration of Patrick Findlay, General Counsel of the NSD, which

describes the agency's search for records responsive to Eddington's request.  *See generally*

Findlay Decl.[3]  The declaration notes that Eddington's request for information was specifically

focused on records in the possession of the NSD.  *See id.*, ¶ 5.  In response to Eddington's

request, the agency determined that several components of the NSD might have non-

investigative, non-classified, and non-exempt responsive documents; it thus initiated a search of

the NSD Office of the Assistant Attorney General, the NSD Office of Law & Policy, and the

NSD Counterterrorism Section.  *Id.*, ¶ 9.  The search was conducted by the NSD FOIA and

Declassification Unit, which searched electronic records using the term "Meshal," and then

manually reviewed all hits.  *Id.*, ¶ 10.  The searches "identified responsive records and [the DOJ]

processed those records."  *Id.*  Findlay avers that all files likely to contain responsive materials

were searched.  *Id.*, ¶ 14 (stating that DOJ did not identify any other sources of information that

were likely to have responsive information that would not be subject to a *Glomar* response).

The NSD did not search the NSD's Office of Intelligence, including the Office of

Intelligence Oversight, because the NSD determined that it was "exceedingly unlikely" that the

---

[2]         In addition, the NSD referred three records to the Civil Division of the DOJ, and two records to the State Department for processing.  *Id.*  On November 8, 2019, the Civil Division released 69 pages, with redactions under Exemptions 5, 6, and 7(C).  Am. Compl., ¶ 14.  The documents released by the Civil Division were email chains regarding a proposed Second Amended Complaint from the Plaintiff's attorney to the Civil Division.  *See* ECF No. 27-3 (Declaration of Hirsh D. Kravitz).  On November 15, 2019, the State Department released one page in full, three pages in part, and withheld 27 pages in full under Exemption 5.  Am. Compl., ¶ 16.  The State Department documents were legal memoranda.  *See* ECF No. 27-4 (Declaration of Eric F. Stein).
[3]         As General Counsel, Findlay oversees the FOIA and Declassification Unit, which is responsible for responding to requests for access to NSD records and information pursuant to FOIA.  *See* Findlay Decl., ¶ 2.

Office would have non-exempt records.  *Id.*, ¶ 13.[4]  The NSD also did not search the

Counterintelligence and Export Control Section, the Foreign Investment Review Section, the

Office of Victims of Overseas Terrorism, or anywhere else within the NSD, because there was

no indication that such locations were reasonably likely to have non-exempt information.  *Id.*, ¶

14.

   With respect to records within the Office of Intelligence, the NSD issued a *Glomar*

response under FOIA Exemption 1, which protects information "specifically authorized under

criteria established by an Executive order to be kept secret in the interest of national defense or

foreign policy."  *Id.*, ¶ 15; 5 U.S.C. § 552(b)(1).  The Office of Intelligence represents the

government before the Foreign Intelligence Surveillance Court ("FISC").  Findlay Decl., ¶ 13.

Further, the Oversight Section within the Office of Intelligence "conducts oversight of NSD's

partners' use of Foreign Intelligence Surveillance Act [("FISA")] authorities."  *Id.*  The Findlay

Declaration states that the "NSD generally does not confirm or deny the existence of records

regarding any particular individual alleged to be a target of FISC-authorized surveillance."  *Id.*, ¶

16.

   The NSD also issued a *Glomar* response under Exemptions 7(A), 6, and 7(C) for

investigative records in the Counterterrorism Section, neither confirming nor denying "whether

its searches uncovered any records related to ongoing investigations or non-public closed

investigations."  *Id.*, ¶ 20.  The Counterterrorism Section serves as a federal prosecuting office

for terrorism-related offenses.  *Id.*, ¶ 9 n.1.  Exemption 7(A) protects "records or information

compiled for law enforcement purposes . . . to the extent that the production of such law

---

[4]     NSD states that "nothing related to the litigation and events described by Plaintiff in his various filings calls
that analysis into question.  Accordingly, NSD FOIA determined that a search of [the Office of Intelligence] would
be an unreasonable burden."  *Id.*, ¶ 13.

enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  The FBI asserts that all records of the Counterterrorism Section are compiled for law enforcement purposes.  *See* ECF No. 27 (Defendant's Motion) at 13 (stating that the Section's responsibilities include "investigating and prosecuting domestic and international terrorism cases.").  The FBI invoked Exemption 7(A) because it asserts that confirming or denying the existence of records could interfere with ongoing attempts to investigate and thwart terrorism attempts against the United States.  *See id.* at 14.  Exemption 6 protects information the release of which "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6); and Exemption 7(C) similarly protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of privacy," 5 U.S.C. § 552(b)(7)(C).  The FBI invoked these exemptions to protect against an unwarranted invasion of the privacy of third parties, asserting that confirming or denying the existence of records might link non-parties to a terrorism investigation.  *See* Def. Mot. at 15.

Eddington asserts that the agency's response to his FOIA request was inadequate.  *See generally* Am. Compl.  He filed a Motion for Partial Summary Judgment, *see* ECF No. 25 (Plaintiff's Motion), in response to which the DOJ filed a combined Opposition and Cross Motion for Summary Judgment.  *See* ECF No. 27 (Defendant's Motion).[5]  The parties' dispute has been narrowed to the propriety of the DOJ's *Glomar* responses with respect to records from the Intelligence and Counterterrorism units of the NSD.[6]

---

[5]      Eddington then filed a Reply, *see* ECF No. 28 (Plaintiff's Reply), as did the DOJ, *see* ECF No. 30 (Defendant's Reply).

[6]      Eddington also challenged the adequacy of the DOJ's searches of the Office of Intelligence and Counterterrorism Section.  *See* Pl. Reply at 8–10.  Those contentions, however, are subsumed by the Court's

# ANALYSIS

Eddington argues that the DOJ's issuance of *Glomar* responses with respect to records in the Office of Intelligence and any investigative records in the Counterterrorism Section was improper, because (1) the DOJ has officially acknowledged the existence of the withheld records; and (2) the DOJ had no basis to invoke Exemptions 1, 7(A), 6, and 7(C) in support of its *Glomar* responses.  *See generally* Pl. Mot. and Pl. Reply; *see also James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 20 (D.D.C. 2018) (*Glomar* response may be challenged in two ways: First, a requester "can demonstrate that the agency has previously 'officially acknowledged' the fact of the existence of a requested record;" and second, the requester "can challenge the agency's assertion that confirming or denying the existence of records would cause harm under the FOIA exception invoked by the agency.") (citation omitted).  The Court addresses these arguments in turn.

## A. The Official Acknowledgment Exception is Inapplicable.

The DOJ justifies its invocation of *Glomar* in part by asserting that the disclosure of the existence or non-existence of responsive documents would reveal whether Meshal or his associates were targets of a counterterrorism investigation or whether they were under government surveillance.  *See* Findlay Decl., ¶¶ 17, 23.  Eddington argues that the DOJ cannot properly invoke a *Glomar* response on that basis because the government has already publicly acknowledged the existence of a counterterrorism investigation and surveillance of Meshal.  *See*

---

analysis of whether the DOJ properly issued a *Glomar* response.  Because the Court finds, *infra,* that the *Glomar* response is appropriate, there is no valid legal challenge to the adequacy of the DOJ's search.  *See Lindsey v. FBI*, 271 F. Supp. 3d at 4 ("To the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents.") (alteration, internal quotation marks, and citation omitted).  Eddington also does not challenge the withholding of personal information under Exemptions 5, 6, and 7(C).  *See* Pl. Reply at 2 n.1 (stating that he "does not seek the release of any individual's personal contact information.").  Accordingly, the DOJ is entitled to summary judgment with respect to those withholdings.  *See*

Pl. Reply at 3–6.  According to Eddington, it is "neither logical nor plausible" that the DOJ

possesses no records responsive to the request, in light of publicly available information about

the government's conduct.  *Id.* at 1.  Eddington identifies three main sources of information that

he alleges constituted official acknowledgments that responsive records exist: (1) evidence in the

*Bivens* lawsuit filed by Meshal; (2) a statement from an FBI media spokesperson that the FBI

interviewed Meshal in Nairobi; and (3) statements made by the FBI and the State Department to

Meshal's family, Eddington, and Representative Holt.  *See id.* at 3–6.[7]

As a general matter, "when an agency has officially acknowledged otherwise exempt

information through prior disclosure, the agency has waived its right to claim an exemption with

respect to that information."  *ACLU v. CIA*, 710 F.3d at 426; *see id.* at 430 (stating that when

government statements render it "neither logical nor plausible" that the government possesses no

responsive records, an official acknowledgment has occurred).  Thus, Plaintiff is correct that a

FOIA requester "can overcome a *Glomar* response by showing that the agency has already

disclosed the fact of existence (or nonexistence) of responsive records, since that is the

purportedly exempt information that a *Glomar* response is designed to protect."  *Id.* at 427.

Official acknowledgment may be established "(1) where the existence of responsive records is

plain on the face of the official statement, and (2) where the substance of an official statement

and the context in which it is made permits the inescapable inference that the requested records

in fact exist."  *James Madison Project v. DOJ*, 302 F. Supp. 3d at 22 (internal citations omitted).

The D.C. Circuit, however, has narrowly construed the "official acknowledgment"

exception, in recognition of the "'the Government's vital interest in information relating to

---

[7]     Eddington also points to numerous news articles written on the subject of Meshal's detention.  *See* Pl.
Reply at 4 n.3.  None of those news articles, however, contain any official acknowledgment of a counterterrorism
investigation of Meshal by the NSD.

national security and foreign affairs.'"  *Wolf*, 473 F.3d at 378 (quoting *Public Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)); *see also Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (stating that the official acknowledgment test is "strict").  An official acknowledgment must meet three criteria: "First, the information requested must be as specific as the information previously released."  *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  The "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."  *Id.* (emphasis in original).  The information already released must also be of the same level of generality as the information sought — broad disclosures, even on the same general topic, do not waive the *Glomar* response.  *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. CIA*, 424 F. Supp. 3d 36, 41–45 (D.D.C. 2020); *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983).

Second, the "information requested must match the information previously disclosed."  *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  Thus, if there are "substantive differences" between the alleged prior disclosure and the information sought, the official-acknowledgment exception fails.  *ACLU v. Dep't of Def.*, 628 F.3d 612, 621 (D.C. Cir. 2011).  This second requirement is essentially the same as the first.  *See Wolf*, 473 F.3d at 379 ("In the *Glomar* context . . . if the prior disclosure establishes the existence (or not) of records . . . the prior disclosure necessarily matches[.]") (emphasis omitted); *see also James Madison Project v. DOJ*, 302 F. Supp. 3d at 21 ("In the *Glomar* context, the first and second prongs . . . merge into one and the third prong continues to operate independently.").

"Third, the information requested must already have been made public through an official and documented disclosure."  *Wolf*, 473 F.3d at 378 (cleaned up).  In other words, the source of

the prior disclosure must be official; non-governmental releases, or anonymous leaks do not

qualify.  *See, e.g.*, *ACLU v. Dep't of Def.*, 628 F.3d at 621–22 (stating the "release of a

nongovernment document by a nonofficial source" cannot constitute an official disclosure);

*Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 330 n.8 (D.D.C. 2015).

"[T]he fact that information exists in some form in the public domain does not necessarily mean

that official disclosure will not cause harm cognizable under a FOIA exemption."  *Wolf*, 473

F.3d at 378.

  Thus, under the foregoing standard, Eddington must point to a specific, official

acknowledgment that the NSD investigated Meshal for terrorism-related activities, in order to

overcome the government's *Glomar* response.  He fails to do so.  Indeed, it appears that no such

acknowledgement has ever been made:  Findlay asserts that he is "unaware of [the DOJ] having

ever disclosed publicly any information that would confirm or deny whether Mr. Meshal was a

subject of an investigation or otherwise related to an investigation that involved [the

Counterterrorism Section]."  Findlay Decl., ¶ 23.

  To support his contrary contention that the DOJ has, in fact, publicly acknowledged that

the NSD investigated Meshal, Eddington first points to the opinion of the D.C. Circuit in the

*Bivens* action that Meshal himself filed against government agents.  *See* Pl. Reply at 3.  In

affirming the district court's dismissal of Meshal's *Bivens* claim, the D.C. Circuit stated that

"[i]n January 2007, Meshal was apprehended by Kenyan authorities, in a joint U.S.-Kenyan-

Ethiopian operation, and transported to Nairobi."  *Meshal v. Higgenbotham*, 804 F.3d at 419.

The opinion goes on to state that "U.S. officials learned about Meshal's detention in Kenya and

thus began a lengthy, multi-jurisdictional interrogation[.]"  *Id.*  Moreover, the Court of Appeals

noted the defendants' assertion that the case would include discovery "from both foreign

counterterrorism officials, and U.S. intelligence officials up and down the chain of command, as well as evidence concerning the conditions at alleged detention locations in Ethiopia, Somalia, and Kenya." *Id.* at 426 (citation omitted).  According to Eddington, the facts disclosed in the *Bivens* action make it "implausible for the Defendant to claim that no records exist about Meshal being held by the Kenyan and Ethiopian governments."  *See* Pl. Reply at 3–4.  The general facts discussed in the D.C. Circuit opinion, however, do not contain any acknowledgment by the government that the NSD investigated Meshal or considered prosecuting him for a terrorism-related offense.  *See Meshal*, 47 F. Supp. 3d 115 (D.D.C. 2014); *Meshal*, 804 F.3d 417 (D.C. Cir. 2015); *see also Wolf*, 473 F.3d at 378 (stating that the requested information must match information previously disclosed).  Further, the DOJ has not publicly commented on the truth of the allegations in the complaint in Meshal's case, and the Counterterrorism Section never provided any records in discovery during the litigation.  *See* Findlay Decl., ¶ 12.  Thus, the cited information from Meshal's *Bivens* action does not amount to an "official acknowledgment" that responsive records exist in the Office of Intelligence or the Counterterrorism Section of the NSD, or that Meshal was the subject of a counterterrorism investigation by the NSD.

Next, Eddington argues that the government officially acknowledged an investigation of Meshal when an FBI spokesperson confirmed to the media in March 2007 that FBI agents had interviewed Meshal in Nairobi.  *See* Pl. Reply at 4.  Despite this alleged acknowledgment, Eddington notes that the DOJ did not produce a single record of any interview from 2007–2014. *See id.*; ECF No. 28-1 (Declaration of Patrick Eddington #2), ¶ 5 (stating that "copies of any FBI interview reports on Meshal . . . would have been supplied to NSD[.]").  Eddington asserts that interview reports must have been "written by the FBI agents in question and circulated inside, and possibly outside, the Department of Justice."  *See* Eddington Decl. #2, ¶ 5.  But Eddington's

FOIA request was for records kept *by the NSD*.  The statement that FBI agents interviewed Meshal in Nairobi does not prove that the NSD is in possession of any records memorializing those interviews.  *See Wolf*, 473 F.3d at 378 (prior disclosure must point to the specific information requested).  Eddington's speculation that FBI records might be at the NSD fails to show a "match" between the information previously acknowledged and the information now sought.  *Id.*[8]

Eddington further contends that communications from the FBI and the State Department to Meshal's father, Eddington, and Representative Holt qualified as official public disclosures.  *See* Pl. Reply at 5–6.  Eddington asserts that the FBI informed Meshal's father that his son was being detained on terrorism charges; that the FBI told Eddington that Meshal was in the custody of the Ethiopian government and that the U.S. government had access to him; and that the FBI explained to Representative Holt that they were gathering information on Meshal.  *Id.*  Eddington also surmises that officials at the FBI and at the State Department "would have necessarily 'had correspondence with NSD personnel and supervisors, as NSD is the coordinating body within DOJ for terrorism-related investigations.'"  *Id.* at 5 (quoting Eddington Decl., ¶ 13).  These contentions do not meet the strict official-acknowledgment test to overcome a *Glomar* response.  Eddington fails to proffer evidence that anyone revealed the existence or non-existence of a

---

[8]    Eddington also asserts that "U.S. agencies confirmed that Meshal was suspected of being a jihadist in training with al Qaeda," citing a newspaper article.  *See* Pl. Reply at 4 (citing ECF No. 28-2, Shashank Bengali and Jonathan S. Landay, *American's Rendition May Have Broken Laws*, McClatchy Newspapers (Mar. 21, 2007) ("Landay Article")).  Eddington mischaracterizes the information in the cited article, which actually states: "FBI agents who interviewed Meshal in Nairobi in early February believed he was a 'jihadist' who'd trained in al-Qaida camps in Somalia, according to an internal U.S. government e-mail that was read to McClatchy Newspapers by officials at two different U.S. agencies."  *See* Landay Article.  First, an unidentified official at an unidentified agency who reads an internal email to a reporter is not making an official acknowledgement.  Second, the cited statement reveals only that certain FBI agents "believed that [Meshal] was a 'jihadist' who trained in al-Qaida camps in Somalia."  *Id.*  This falls far short of a specific disclosure that Meshal was investigated by the NSD for terrorism-related activity.  *See Afshar*, 702 F.3d at 1133 (finding that generalized statements or information are not specific enough to overcome a *Glomar* response).

counterterrorism investigation *by the NSD* during these communications; and therefore, it cannot be said that the specific information sought by Eddington's FOIA request has already been officially disclosed.  Because "prior disclosure of similar information does not suffice," general statements about Meshal and his detention are not enough to constitute an official acknowledgment that either the Office of Intelligence or the Counterterrorism Section of the NSD investigated Meshal.  *See James Madison Project v. DOJ*, 330 F. Supp. 3d 192, 204 (D.D.C. 2018); *see also Wolf*, 473 F.3d at 378 (the public acknowledgements must be "specific," and the information sought must "match the information previously disclosed").

In sum, Eddington's numerous contentions do not support a conclusion that there has been an official disclosure of the specific information sought in his FOIA request.  He thus fails to meet the D.C. Circuit's "strict" test to overcome the DOJ's *Glomar* response.

B. The DOJ Properly Invoked FOIA Exemptions 1, 7(A), 6, and & 7(C) in Support of its *Glomar* Responses.

1. *The Glomar Response Regarding Records in the Office of Intelligence under Exemption 1 was Appropriate.*

The DOJ's *Glomar* response regarding the records in the Office of Intelligence relies on FOIA Exemption 1 and Executive Order 13,526.  *See* Def. Mot. at 11.  The Office of Intelligence represents the government before the Foreign Intelligence Surveillance Court ("FISC"), and the Oversight Section within the Office of Intelligence conducts oversight of NSD's partners' use of intelligence information obtained under the Foreign Intelligence Surveillance Act ("FISA").  Findlay Decl., ¶ 13.  The DOJ states that absent highly unusual circumstances, "NSD generally does not confirm or deny the existence of records regarding any particular individual alleged to be a target of FISC-authorized surveillance."  *Id.*, ¶ 16.  The DOJ further asserts that the submission of a FISA application to conduct surveillance constitutes classified information that

implicates national security, as is the identity of any specific individual who is the subject of a national-security investigation making use of a FISA warrant.  *Id.*

FOIA Exemption 1 protects information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  "Thus, an agency attempting to withhold information under exemption 1 must show that it 'complies with classification procedures established by the relevant executive order and withholds only such material as conforms to the order's substantive criteria for classification.'" *Mobley v. DOJ*, 870 F. Supp. 2d 61, 66 (D.D.C. 2012) (quoting *King v. DOJ*, 830 F.2d 210, 214 (D.C. Cir. 1987)).  To sustain an Exemption 1 withholding, the agency's arguments "need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context.'" *ACLU*, 628 F.3d at 624 (citing *Wolf*, 473 F.3d at 374–75).

There is no genuine dispute that the existence or non-existence of records in the Office of Intelligence was classified information under Exemption 1.  The information meets the four requirements enumerated in Executive Order 13,526 for a record to be deemed classified: (1) an Original Classification Authority is the one making the classification; (2) the information is owned, produced by or for, or under control of the Government; (3) the information falls within one of eight categories, which include "intelligence activities (including covert action), intelligence sources or methods;" and (4) the Original Classification Authority has determined "that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security[.]"  *See* Exec. Order 13,526, §§ 1.1, 1.4(c), 75 Fed. Reg. 707 (Dec. 29, 2009).

With respect to the first two requirements, Findlay is an Original Classification Authority, and the records of the Office of Intelligence are within the control of the government. *See* Findlay Decl., ¶ 3, 15–19.  Moreover, the existence of any responsive records is information that falls within the category related to intelligence activities, sources, or methods:  The Findlay Declaration states that under the National Security Information Security Classification Guide ("NSISCG"), "the fact that a FISA application was submitted or used in a particular case is classified national security information, as is the identification of specific individuals or organizations who are subjects of a national security investigation making use of a FISA warrant."  *Id.*, ¶ 16 (citing DOJ NSISCG, July 2012, at 34); *see also id.*, ¶ 18 (noting that "DOJ NSISCG confirms the classified nature of any statement acknowledging the existence of FISA-related records of the type [the Office of Intelligence] typically maintains responsive to plaintiffs' FOIA request[.]"); *see also id.*, ¶¶ 13, 16–17.  Finally, Findlay determined that disclosing whether any responsive records exist would harm national security.  *Id.*, ¶¶ 17, 19. Findlay states that "[t]o disclose the existence or non-existence of responsive documents . . . would tend to reveal whether Meshal or his associates were targets of FISC-authorized surveillance.  Merely acknowledging the existence or non-existence of records . . . therefore, would reasonably be expected to trigger harm to national security."  *Id.*, ¶ 17.[9]

---

[9]    Findlay elaborates, as follows:

> [R]evealing the absence of such responsive records in [the Office of Intelligence's] files would tend to indicate that persons within the scope of the request were not pertinent to the approval of FISA applications.  That fact could be extremely valuable to foreign powers and hostile intelligence services who could use it to carry out activities with the knowledge that the U.S. Government is or was not monitoring certain people and may not even have suspected them.  As a result, the best way for NSD to protect critical intelligence information and minimize harm to national security for the Government is to assert a *Glomar* response to requests for information pertaining to operational FISA work of the type maintained in [the Office of Intelligence's] files.

Findlay Decl., ¶ 19.

Accordingly, the existence or non-existence of records in the Office of Intelligence is a fact that the DOJ properly classified, and the agency's *Glomar* response relying on Exemption 1 was appropriate.  Eddington provides no specific argument to dispute the DOJ's representations, and there is therefore no genuine dispute of material fact on this point.

        2.   *The Glomar Response to Investigative Records in the Counterterrorism Section under Exemption 7(A) was Appropriate.*

The DOJ also invoked a *Glomar* response with respect to investigative records compiled for law-enforcement purposes in the Counterterrorism Section, under Exemption 7(A).  *See* Def. Mot. at 12; Findlay Decl. ¶¶ 20–23.  The FOIA exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The term "law enforcement" encompasses "the enforcement of national security laws."  *Strang v. U.S. Arms Control and Disarmament Agency*, 864 F.2d 859, 862 (D.C. Cir. 1989).  "To justify the withholdings of records under Exemption 7(A), [an agency] must 'demonstrate that disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'"  *Buzzfeed, Inc. v. DOJ*, 344 F. Supp. 3d 396, 403 (D.D.C. 2018) (quoting *Citizens for Responsibility and Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014)).

According to the DOJ, the Counterterrorism Section "serves as a federal prosecuting office for terrorism-related offenses."  Findlay Decl., ¶ 9 n.1.  Here, there is no genuine dispute as to whether any responsive records in the Counterterrorism Section's investigative files are law enforcement records under Exemption 7(A).  Eddington makes no argument to the contrary.  Thus, the focus of the Court's analysis is whether "disclosure [of the existence of records] could

reasonably be expected to interfere with enforcement proceedings that are pending or reasonably anticipated." *Buzzfeed, Inc. v. DOJ*, 344 F. Supp. 3d at 403 (cleaned up).

The DOJ argues that if the agency "were to begin confirming or denying the existence of past or present terrorism-related investigations, it could interfere with ongoing attempts to investigate or thwart those who seek to perpetuate such crimes on the United States." *See* Def. Mot. at 14. According to the DOJ, if it confirmed that it has investigated Meshal, "potential terrorists would know that any potential methods or apparatus pertaining to Meshal . . . may now be within the knowledge of prosecutors;" and if the agency confirmed that it had not investigated Meshal, "it could signal that those mechanisms are free from prosecutorial knowledge and oversight." *Id.*

Eddington's only challenge to the Exemption 7(A) *Glomar* response is his claim that it is already common knowledge that Meshal was investigated for terrorism-related offenses, based on Meshal's *Bivens* action, the previously cited news articles, and other alleged acknowledgments. *See* Pl. Reply at 8. But as discussed, *supra,* the Court rejects Eddington's contention that the DOJ publicly acknowledged a terrorism-related investigation of Meshal by the NSD. Further, the Court agrees with the DOJ that confirming or denying the existence of records in the hands of the NSD would reveal whether prosecutors investigated Meshal for terrorism-related offenses; and that this could provide insight into the information that the government has at its disposal as it attempts to prevent and prosecute terrorism crimes. *See Buzzfeed*, 344 F. Supp. 3d at 404 (upholding a *Glomar* response under Exemption 7(A) because confirming whether records exist would provide criminals insight into, and allow them to thwart or impede, ongoing investigations). Thus, revealing whether the records exist "could reasonably

be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), and the DOJ's *Glomar* response under Exemption 7(A) was appropriate.

3.   *The Glomar Response to Investigative Records in the Counterterrorism Section under Exemptions 6 and 7(C) was Appropriate.*

The DOJ also invoked Exemptions 6 and 7(C) in neither confirming nor denying whether its searches uncovered any records in the Counterterrorism Section that "related to ongoing investigations or non-public closed investigations."  Findlay Decl., ¶ 20.  The DOJ asserts that confirming or denying that investigative records exist in the Counterterrorism Section might identify an individual as a subject of a terrorism-related investigation, which would plainly stigmatize that individual and constitute an unwarranted invasion of privacy.  *See* Def. Mot. at 15.  Exemption 6 encompasses "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6); and Exemption 7(C) protects law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C).  In response, Eddington argues that the privacy interests in this case are "minimal at most" because Meshal himself has already publicly stated that the government investigated him for terrorist activity.  *See* Pl. Reply at 6–7.

When information is claimed to be exempt under both Exemptions 6 and 7(C), courts focus on Exemption 7(C) because it provides "broader privacy protection" than Exemption 6. *See Citizens for Responsibility and Ethics in Wash. v. DOJ*, 854 F.3d 675, 681 (D.C. Cir. 2017) (citation omitted).  Because there is no genuine dispute that the records at issue are law enforcement records, *see supra*, the Court constrains its analysis to whether the invocation of Exemption 7(C) was proper in making the *Glomar* response.

Under Exemption 7(C), "a *Glomar* response may be issued in place of a statement acknowledging the existence of responsive records but withholding them, if confirming or denying the existence of the records would associate the individual named in the request with criminal activity." *Donato v. Exec. Office for U.S. Attorneys*, 308 F. Supp. 3d 294, 310 (D.D.C. 2018).  This is because the "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (citation omitted).  "There can be no clearer example of an unwarranted invasion of personal privacy than to release to the public that another individual was the subject of a law enforcement investigation." *People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 542 (D.C. Cir. 2014) (cleaned up); *see also Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) ("[I]ndividuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation.").  In evaluating the assertion of Exemption 7(C), the court must "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  The D.C. Circuit has held that "unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991).

The parties dispute the significance of the privacy interests implicated by the records at issue.  The DOJ argues that Meshal's privacy interests are substantially implicated because the Counterterrorism Section has never confirmed or denied the existence of an investigation into

Meshal; and confirming or denying the existence of such records might associate Meshal with such an investigation, subjecting him to stigma.  *See* Def. Mot. at 16–17.  Eddington insists that the asserted privacy concerns are greatly diminished by the publicly available information about Meshal's treatment by the government and Meshal's own statements about his experience.  *See* Pl. Reply at 6–7.  But Eddington is asking for records concerning a third party, Meshal.  Eddington is not in a position to waive Meshal's right to privacy with respect to the requested records.  Any response to Eddington's request could risk associating Meshal with an official terrorism investigation, which has not been previously acknowledged.  Because Eddington does not "have consent to disclosure" from Meshal, *see Schwarz v. U.S. Dep't of Treasury*, 131 F. Supp. 3d 142, 150 (D.D.C. 2000), the privacy interests implicated are still substantial.  Accordingly, the DOJ is on firm ground in providing a *Glomar* response under the present circumstances.  *See, e.g.*, *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 24 (D.D.C. 1998) (upholding a *Glomar* response when existence of records would link named individuals with taking of hostages in Iran); *Schwarz* , 131 F. Supp. 2d at 150 (finding that employing a *Glomar* response under Exemption 7(C) is appropriate in connection with a request for law enforcement records of a third party).

Eddington further argues that there is a substantial public interest in knowing the DOJ's role in the detention of a Muslim-American citizen in the wake of 9/11, and in understanding whether the DOJ participated in violating a U.S. citizen's Fourth and Fifth Amendment rights.  *See* Pl. Reply at 7.  Eddington asserts that those public interests outweigh Meshal's privacy interest because the privacy interests are "nonexistent."  *Id.* (citing *Hidalgo v. FBI*, No. 04-cv-0562, 2005 WL 6133690 (D.D.C. Sept. 29, 2005)).[10]  While Eddington may be correct that there

---

[10]     Eddington's reliance on *Hidalgo* is misplaced.  In *Hidalgo*, the plaintiff sought information about an FBI informant, who had an extensive criminal history, including numerous convictions.  *Hidalgo*, 2005 WL 6133690, at

are public interests in the disclosure of such documents, he is incorrect that they outweigh the substantial privacy interests present in this case.  As discussed, *supra*, the DOJ has not made an official acknowledgement of any terrorism investigation of Meshal.  Thus, Meshal, as a third party, retains a substantial privacy interest that goes to the heart of Exemption 7(C).  *See People for the Ethical Treatment of Animals*, 745 F.3d at 540 (finding that when acknowledging the existence of documents would confirm an investigation into an individual, such confirmation is exactly the kind of privacy interest Exemption 7(C) is designed to protect).  The Court therefore concludes that Meshal's privacy interests outweigh any public interest in disclosure, *see Davis*, 968 F.2d at 1281, and that the DOJ appropriately invoked Exemption 7(C) in making its *Glomar* response.

## CONCLUSION

For the foregoing reasons, the Court finds the DOJ's invocation and use of *Glomar* reasonable under the circumstances.  The Court therefore grants Defendant's Motion for Summary Judgment and denies Plaintiff's Partial Motion for Summary Judgment.  A separate Order will issue this day.

_____
Florence Y. Pan
United States District Judge

Date: January 25, 2022

---

*1. In that case, the FBI had publicly acknowledged the third party's role as a cooperator.  *Id.*  Thus, the court in *Hidalgo* found a *Glomar* response under Exemption 7(C) inappropriate because, under those circumstances, the third party was "hardly stigmatized by public confirmation of the fact that the FBI ha[d] files on him."  *Id.*  By contrast, Meshal has not been charged or convicted of any crime; and the DOJ has never publicly acknowledged that Meshal was even investigated for terrorism-related activities.